UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

V.                                          NO. 08-150

MICHAEL MELANCON                            SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court is the defendant's Motion to Suppress
Statements and Evidence.  For the reasons that follow, the
defendant's motion is DENIED.

<u>Background</u>

The facts underlying the federal charges of obstruction of
justice and making false statements to federal agents that Michael
Melancon faces arise out of federal criminal charges against his
nephew.[1]

On January 21, 2008, David Melancon was shot while in a
vehicle during a shootout at the Fisher Housing Development; he
returned fire.  The gun that David Melancon fired was recovered,
and police ballistically matched the casings found inside the
vehicle he was driving.  Although David Melancon refused to

_____

    [1]  These charges arise from a follow-up investigation by
federal authorities concerning an affidavit that was given to the
Government by then-attorney Gary Wainwright, who previously
represented the nephew, David Melancon.  The affidavit, which was
prepared by inmate counsel Michael Melancon, a co-defendant and
uncle, was signed by Jamar Higgins, who said he witnessed the
January 21, 2008 shootout between David Melancon and Arnold Wyatt
and others.  This affidavit contradicted and sought to recant
Higgins' prior statements to law enforcement officials concerning
this incident.

1

cooperate with the police investigation,[2] a confederate of his, Jamar Higgins cooperated: he drove Melancon to the hospital after the shootout, discarded the gun in the hospital parking lot, and talked to the police: he told the police that Melancon had returned fire, identified Arnold Wyatt as one of the people that shot David Melancon, and took the police to where he had discarded the gun.

On June 6, 2008, the federal grand jury returned a one-count indictment charging David Melancon with being a felon in possession of a firearm. He was arrested on June 24, 2008, was arraigned on June 30, 2008, and on December 16, 2008, a change of plea hearing was scheduled for January 8 and then rescheduled for February 19, 2009. On that date, David Melancon did not plead guilty; the rearraignment proceeding was continued without date.

Meanwhile, Michael Melancon (David's uncle and co-defendant in this federal case) was at that time and is currently serving a 20-year prison sentence as a multiple offender on drug convictions at Rayburn Correctional Center in Angie, Louisiana; from June 2002 until March 13, 2009 he served as "inmate counsel" at Rayburn. Sometime after David Melancon's arrest, Gala Melancon (David's mother and Michael's sister), who visits her brother frequently accompanied by Joequal MacCaleb (David Melancon's girlfriend)

---

[2] David Melancon allegedly told the police that he did not know who shot him; however, while laying in his hospital bed, he stated that "them nig...s done started a war, they will never win."

called Michael Melancon at Rayburn to discuss David Melancon's case. According to Michael Melancon, they hoped that his experience as inmate counsel would provide helpful legal insight. Joequal MacCalebb forwarded to Michael Melancon a letter she had received from David Melancon, which also included a draft "Factual Basis"; Michael Melancon says he received those documents on February 18, 2009.

Overlapping Michael Melancon's imprisonment at Rayburn, one Jamar Higgins was incarcerated there from February 2, 2009 until March 6, 2009; as noted, Higgins is a potential witness in the federal firearms case against Michael Melancon's nephew, David. It is the contact between Higgins and Michael Melancon at Rayburn that is the subject of the current federal charges against Michael Melancon.

Michael Melancon says that he had never met Higgins and they were not aware of each other's presence until they were introduced by other unidentified inmates. At that time, the story goes, Higgins was seeking the help of inmate counsel because -- despite having agreed to cooperate with the Government in the federal case against David -- Higgins wanted to recant and was looking to draft an affidavit attesting that David Melancon did not possess a firearm at the time of his arrest.[3]

_____

[3] Michael Melancon says that he was concerned about limiting his involvement in his nephew's case, so he insisted that Higgins fully draft the content of the affidavit himself. Melancon

According to Michael Melancon, Higgins prepared a handwritten statement outside of Michael Melancon's presence and gave the document to Michael Melancon who, as inmate counsel, had access to a computer. Melancon says he merely typed the exact language contained in the document and arranged for notarization of the typed affidavit on February 20, 2009. Melancon then sent a copy of the typed and notarized affidavit to David Melancon's then-attorney, gave a copy of the affidavit to Higgins, and kept one for his records. Another copy was sent to his sister and David's mother, Gala Melancon. Still another copy of the affidavit was provided to the Government by David Melancon's then-attorney. Because the Higgins affidavit contradicted and sought to recant Higgins' prior statements to law enforcement officials concerning the shootout, the Government decided to investigate the circumstances surrounding and the motivations underlying the drafting of the affidavit.

After he left Rayburn on March 6, 2009, Higgins was incarcerated in Orleans Parish on unrelated state charges. Assistant United States Attorney Maurice Landrieu, who was prosecuting the case against David Melancon, and Agent Suzanne Pecora of the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, visited Higgins in Orleans

---

says that he also discussed the situation with Michael Dickerson, Senior Inmate Counsel at Rayburn, who confirmed that this was the proper procedure.

Parish Criminal District Court on March 12, 2009.  They questioned him about the affidavit he signed at Rayburn; Higgins said that he had been pressured by Michael Melancon into signing the affidavit and that its contents were false.[4]

The next day, on March 13, 2009, in the course of investigating Higgins' allegations, AUSA Landrieu and Agent Pecora visited Rayburn.[5]  They tell an entirely different story.  They spoke with the staff and then Michael Melancon was summoned to the

---

[4] Higgins told the federal authorities that he had recently been sentenced in a state drug case and sent to Rayburn Correctional Facility to serve his sentence; within a few days of arriving at Rayburn, Higgins says that he was approached by an inmate named Michael Melancon, who was an "inmate counsel" at Rayburn.  According to Higgins, Michael Melancon pressured him to recant his earlier statements to federal authorities about David. Concerned for his personal safety, Higgins says he signed multiple copies of the affidavit which had been prepared and typed by Michael Melancon.  Higgins told the authorities that Michael Melancon also had him copy the affidavit in his own handwriting; he returned the signed affidavits and the handwritten copy to Michael Melancon.  He said he felt he had no choice, as he did not want to be known as a "rat" in jail.

[5] After speaking to Higgins, federal authorities decided to interview the officials at Rayburn to determine if Michael Melancon was indeed an inmate and whether he was "inmate counsel." They also sought to verify whether Higgins had recently been an inmate at the facility, whether Rayburn personnel were aware of the Higgins affidavit, and whether they were aware of the existence of any documents concerning David Melancon's federal case that may have been in the facility.  Also they wanted to get any recorded telephone calls from the facility that might have been relevant to their investigation.  The motion before the Court initiates a collision between the story told by Michael Melancon, a multiple drug felon, and Higgins, himself not an admirable person, supported by law enforcement personnel.  A collision that focuses the evidence and credibility thresholds.  Melancon's testimony was inconsistent and not credible.

office area of the facility by a correctional officer to the warden's office so that they could speak with him. When he reached the office area, Michael Melancon was asked to meet with Agent Pecora and AUSA Landrieu in the warden's office. Pecora and Landrieu introduced themselves by shaking his hand and showing him their credentials. They told Melancon why they were there and that they wanted to speak to him about the Higgins affidavit. When asked, Melancon confirmed that he was an inmate counsel. Landrieu says he told Melancon that he did not have to speak to them if he did not want to; Melancon stated that he had been inmate counsel for about seven years and that he knew his rights; he stated that he knew that he had the right to have an attorney present if he wanted one. Landrieu asked if he wanted to have an attorney present; Melancon said that he did not want an attorney and that he would fully cooperate with the investigation. The interview followed.

During the interview, Melancon somehow knew of Higgins' girlfriend. Melancon told them the same story he tells in Court now: that Higgins approached him when he arrived at Rayburn; that Higgins said that he wanted to write an affidavit because the information he had previously given to law enforcement about David Melancon was false. Michael Melancon said that he was concerned about helping Higgins write an affidavit and that he spoke to family, friends, and Michael Dickerson, who was another inmate

counsel, about the situation before deciding to help Higgins.[6]

Melancon was then given a copy of the Affidavit of Verification and asked if he had seen it before. According to the Government, Melancon appeared to be shaken and nervous; Melancon suggested that it was a copy of the document he helped Higgins prepare. He was then shown a clean unsigned copy of David Melancon's proposed factual basis and asked if he had seen it before. He said that he had received a letter from David Melancon's girlfriend asking for advice about his case but he could not remember if a copy of the factual basis was enclosed with the letter. He recalled that the letter contained some of the same information that was in the factual basis. He insisted that he was simply helping out a family member who wanted legal advice about what constituted "constructive possession."

Michael Melancon then stated that, after he agreed to help Higgins, Higgins himself prepared a handwritten statement which Melancon then simply typed on the computer in the form of an affidavit. He said that Higgins then brought the affidavit to Mr. Hannemann, who is a notary at the prison, to have the affidavit notarized. Melancon then stated that he (Melancon) sent several copies of the affidavit to David Melancon's then-attorney, to

---

[6] Whether Melancon, a convicted multiple drug felon, was concerned about an ethical process, or had other concerns, is unclear. He says that although he is the uncle of David Melancon, the fact that Higgins sought him out was a mere "coincidence."

David's mother, and to David's girlfriend.

Melancon then told the federal officials that he still had copies of the Higgins affidavit and the handwritten document. According to the Government, Melancon voluntarily agreed to provide the documents to Agent Pecora. Melancon then left the warden's office with a correctional officer to help him find the documents in his bunk area. A few moments later, Melancon returned with an original Affidavit of Verification, which was signed and notarized, and a second unsigned copy of the same document, as well as the handwritten statement of Higgins. Agent Pecora, AUSA Landrieu, and Melancon each initialed the documents. Copies were made; Agent Pecora kept the originals provided by Melancon and left Melancon with copies.

Agent Pecora then asked Melancon whether he had spoken to David Melancon's family or girlfriend by phone. Melancon stated that he usually speaks to David's mother at the beginning of each month and that he had spoken to her on two occasions on the same date, some time after Higgins had signed and notarized the affidavit; during one of those calls with his sister he read the Higgins affidavit to her and, he claims, she told him not to get involved.

During this conversation, a correctional officer brought into the warden's office yet another document that was found in Melancon's bunk area but was not turned over by him. This document

was identified as David Melancon's four-page proposed factual basis for his criminal case concerning the shootout; it was shown to Michael Melancon. When confronted with the factual basis found in his bunk area but not turned over, Melancon suddenly remembered that he received it, but he said, only after Higgins had signed and notarized the affidavit. When asked why he was in possession of David's factual basis and why he did not turn that document over earlier when he retrieved the Higgins affidavit, Melancon had no answer.

Based on the statements he made, the documents he provided, the documents in his bunk area the correctional officer discovered, and his reaction to some of their questions, AUSA Landrieu stated that it appeared that Michael Melancon might have obstructed justice by intimidating Jamar Higgins into signing the affidavit; AUSA Landrieu stated that such facts would make a compelling opening statement. It was then, the Government submits, that Melancon stated that he wanted to speak to an attorney before he answered any more questions.

At this point, the interview ended and Agent Pecora and AUSA Landrieu left the warden's office and met with the Rayburn staff in the common area outside the office. Melancon remained in the warden's office; the door was open. Several minutes later, Melancon asked if he could speak to Agent Pecora and AUSA Landrieu. He also asked if Major Crawford could be present. Pecora,

Landrieu, and Crawford went back inside the warden's office to meet with Melancon, at which time Melancon stated that he had no intent to obstruct justice and that the telephone calls from the prison facility would prove that. When asked if he wanted to say anything else, he stated that he just wanted to make sure that Agent Pecora and AUSA Landrieu knew that he fully cooperated with the investigation. The interview then ended, again. After another brief meeting with Rayburn staff, Pecora and Landrieu left the facility.

Later, however, on April 3, 2009, Major Crawford called Special Agent Pecora and informed her that additional documents concerning David Melancon had been recovered from Michael Melancon while he was in the visitation area of the prison. According to Crawford, Michael Melancon had been meeting with his sister, Gala Melancon (David's mother) and another woman. During this meeting, Michael Melancon had attempted to transfer several documents to his sister, including a letter written by David Melancon, as well as an envelope post-marked February 17, 2009, addressed to Michael Kevin Melancon at Rayburn with a return address for Joequal McCalebb (David Melancon's girlfriend).[7] Believing these documents might be

_____

[7] On March 13, 2009, Melancon had told law enforcement about the letter but claimed that it was from the girlfriend of David Melancon, not David, whom he said was seeking legal advice on his case. Michael Melancon failed to produce this letter when he turned over the Higgins affidavit and told the federal authorities that he believed he had disposed of the letter. Correctional officers had failed to locate the letter when they found the David

relevant to the federal investigation, Major Crawford had the documents confiscated and turned them over to Agent Pecora.

On June 18, 2009 Michael Melancon was charged in a superseding indictment with several counts of obstruction of justice and making false statements to federal agents.[8] In Count 4, he is charged with conspiracy to obstruct justice. In Count 5, he is charged with the substantive offense of obstruction of justice. In Counts 6, 7, 8, and 9, he is charged with making false statements to a federal agent during his interview on March 13, 2009. Finally in Count 10, he is charged with another act of obstruction of justice because of the April 3, 2009 incident.

Michael Melancon moves to suppress the statements he made to federal agents on March 13, 2009 and the items confiscated from the prison visitation area on April 3, 2009.

## I. Fifth Amendment

Michael Melancon first seeks to exclude from evidence any statements he made to Agent Pecora and AUSA Landrieu on March 13, 2009 on the ground that the statements were the result of custodial interrogation and are inadmissible because he was not first advised of his Miranda rights.

"No person shall be compelled in any criminal case to be a

_____

Melancon factual basis in Michael Melancon's bunk area.

    [8] David Melancon was charged in five of the 10 counts of the superseding indictment with violations of the drug laws, gun laws, and witness tampering laws.

witness against himself." U.S. Const. amend. V. The Self-Incrimination Clause guarantees against infringement "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." Missouri v. Seibert, 542 U.S. 600, 607 (2004)(quotation omitted). The Fifth Amendment, implemented by Miranda v. Arizona, 384 U.S. 436 (1966), protects an accused's right against self-incrimination by prohibiting unwarned custodial interrogations. As the Supreme Court has also observed:

> Miranda conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and giving a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver.

Seibert, 542 U.S. at 608-09 (citation omitted).

Initially, neither side focused on whether inadequate or incomplete warnings were given; rather, they drew battle lines on whether the defendant was in custody at the time. That is an issue whose centrality trumps glimpses of one's extensive familiarity with the justice system and how to beat it. Melancon contends that the statements he made on March 13, 2009 must be suppressed because they were made during a custodial interrogation that was not preceded by Miranda warnings. The Court disagrees.

12

An obligation to administer <u>Miranda</u> warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" <u>Stansbury v. California</u>, 511 U.S. 318 (1994)(per curiam)(quotations and citations omitted). Custody is another issue here. An interrogation is considered "custodial" generally when a police officer or investigator has initiated questioning after a defendant has been deprived of his freedom of action in a significant manner. <u>Miranda,</u> 384 U.S. at 444. The defendant has the burden of proving that he was under arrest or in custody. <u>United States v. Davis</u>, 792 F.2d 1299, 1309 (5th Cir. 1986). This is fact-driven. Determining whether an individual is in custody requires an "exam[ination of] all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" <u>Stansbury</u>, 511 U.S. at 322 (citations omitted).

Accordingly, the Court must look at the totality of the circumstances to determine whether Melancon was "in custody." <u>United States v. Sutera</u>, 933 F.2d 641, 646 (8th Cir. 1991); <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985); <u>see</u> <u>also</u> <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983). Some factors to be considered in applying this analysis, among others, are the location of the interrogation, <u>United States v. Brown</u>, 7 F.3d 1155, 1164 (5th Cir. 1993), the purpose and the length of questioning, and

whether the defendant was informed that he was under arrest. United States v. Sutera, 933 F.2d at 646; United States v. Helmel, 769 F.2d at 1320.[9]

One of the contextual factors the Court must consider here, in determining whether Melancon was in custody when he was questioned on March 13, 2009, is the prison setting. The Fifth Circuit has written, "[i]t is generally accepted that 'a prison inmate is not automatically always in custody within the meaning of Miranda.'"[10] United States v. Smith, 7 F.3d 1164, (5th Cir. 1993)(citing United States v. Conley, 779 F.2d 970, 973 (4th Cir. 1985), cert. denied, 479 U.S. 830 (1986); United States v. Willoughby, 860 F.2d 15, 23-24 (2d Cir. 1988), cert. denied, 488 U.S. 1033 (1989); Flittie v. Solem, 751 F.2d 967, 974-75 (8th Cir. 1985), cert. denied, 475 U.S.

---

[9] In Helmel, the defendant was interviewed at his home by Internal Revenue Agents. He was told that he was not under arrest and was questioned for approximately two hours. Under such circumstances, the Eighth Circuit found that the defendant was not "in custody" for the purpose of Miranda.

[10] This principle is undisputed between the parties here and indeed has been accepted by appellate courts that have determined that the Supreme Court did not create a per se Miranda requirement when interviews are conducted of inmates in prison. In Mathis v. United States, 391 U.S. 1 (1968), the Supreme Court held, with little analysis as to the details of the interrogation, that a defendant who was an inmate in state jail and questioned by an internal revenue agent as to whether he had prepared tax returns and as to whether he would consent to extend the statute of limitations on the tax returns, was entitled to Miranda warnings. But as the Ninth Circuit has observed, any per se Miranda requirement in inmate interviews would create the absurd result of providing inmates greater protection than the non-imprisoned masses. See Cervantes v. Walker, 589 F.2d 424 (9th Cir. 1978).

1025 (1986)).[11]

Thus, the custody status of an inmate is conditioned on the presence of the "essential ingredients of a 'police-dominated atmosphere' and compulsion." Illinois v. Perkins, 496 U.S. 292, 296 (1990)(undercover law enforcement officer posing as inmate was not required to give Miranda warnings to an incarcerated suspect before asking questions that could illicit an incriminating response). Whether Miranda warnings are required prior to prisoner interrogations generally depends on whether there is a "change in the surroundings of the prisoner which results in an added imposition on his freedom of movement" Cervantes v. Walker, 589 F.2d 424, 428 (9th Cir. 1978) such that "a reasonable person would perceive that the police have imposed additional restraints on his freedom of action." United States v. Jamison, 509 F.3d 623, 629

---

[11] In Smith, a prison inmate was indicted on two counts of knowingly and willfully threatening the life of then-President Bush. The Fifth Circuit held that the investigator's failure to give Miranda warnings to the inmate during the interview did not prevent prosecution of a new crime -- an additional threat against the President, which was made during the interview; the appellate court pointed out the distinction between inculpatory statements and crimes. Smith, 7 F.3d at 1167 and n.6. While the Fifth Circuit acknowledged that "a prison setting may increase the likelihood that an inmate is in 'custody' for Miranda purposes," the court avoided making that determination, finding instead that -- even if Miranda was violated -- the evidence of the renewed threat constituted a new crime rather than evidence of a prior offense. Id. (noting that the investigators told the inmate that he was not required to say anything and that he was free to leave the office at any time but pointing out that, even in light of these statements, the inmate might not have felt free to leave and might have perceived the interview as a custodial interrogation).

(4th Cir. 2007)("When, by definition, the entire population of inmates is under restraint of free movement, a person cannot be deemed to be in custody unless a reasonable person would perceive that the police have imposed additional restraints on his freedom of action"). Thus, an inmate is not "in custody" when there is no "added imposition on his freedom of movement" nor "any measure of compulsion above and beyond imprisonment." United States v. Menzer, 29 F.3d 1223, 1232 (7th Cir. 1994). To conclude otherwise would be to elevate guile over substance.[12]

Similar to the various factors considered by courts making custody determinations in non-prison settings, the Ninth Circuit focused on four factors in determining whether the officials' conduct would cause a reasonable inmate to believe there had been a restriction on his freedom over and above the normal prison environment: (1) the language used to summon the individual; (2) the physical surroundings of the interrogation; (3) the extent to which the prison officials confront the individual with evidence of his guilt; and (4) whether the officials exerted any additional

_____

[12] These are simply ways of restating the generally applicable test -- the test is an objective one and the relevant inquiry is "how a reasonable person in the suspect's position would have understood his situation" Berkemer v. McCarty, 468 U.S. 420, 442 (1984)(roadside questioning of motorist detained pursuant to routine traffic stop did not constitute "custodial interrogation") -- in light of the prison setting. Here, the Government contends that Melancon falsely said he would cooperate, an indication he might not have felt added custodial restraint, even if he was dissembling.

pressure to detain the individual.  <u>Cervantes v. Walker</u>, 589 F.2d 424, 428 (9th Cir. 1978).  These factors inform the Court's totality of the circumstances analysis, while recognizing that discussions between inmates and officials occur at times and are not necessarily custodial.

On March 13, 2009, Michael Melancon was working in the prison yard when he was told to attend a meeting in the warden's office; he was not told (for his own safety concerns) who wanted to speak to him or what the meeting was about.  He was permitted to get to the meeting on his own.[13]

According to the record, the warden's office resembles an ordinary office; there are no bars, razor wire, fences, gates or other armed guards watching over the space from guard towers. Other prison staff and prison trustees walk in and out of the office complex doing their routine daily work.

When Melancon arrived in the office area, he was not frisked or placed in restraints.  He was asked to meet with Agent Pecora and AUSA Landrieu in the warden's office.  He was introduced to Agent Pecora and AUSA Landrieu; the parties shook hands and the federal authorities showed him their credentials.  (Melancon disputes that he was told that Landrieu was a federal prosecutor.) Pecora and Landrieu were dressed in plain clothes, they were not

---

[13] Of course, he would face a disciplinary process if he refused to attend the meeting: he was in prison.  But there were not even any guards with him during the meeting.

armed with a firearm or restraints, batons, or any objects that could be used as a show of force or intimidation.

At the beginning of the meeting, the federal authorities explained why they were there and that they wanted to speak to him about an affidavit that Jamar Higgins had signed while at Rayburn. The credible evidence convinces that the federal authorities told Melancon that he did not have to speak to them if he did not want to. Melancon responded that, as inmate counsel, he knew his rights; he specifically stated that he knew he had the right to have an attorney present. As inmate counsel of several years, this story makes sense because when later confronted about his "cooperation" he said he wanted a lawyer.[14]

As the interview continued, another correctional officer brought David Melancon's factual basis to the warden's office, a document which Michael Melancon had previously claimed he had not seen and did not give to the authorities. The correctional officer stated that he had located the document in Melancon's bunk area. Melancon then tried to explain away the factual basis. It was at this time that AUSA Landrieu confronted Melancon with comments about possible evidence of his guilt, suggesting that the circumstances surrounding this case and the evidence collected

---

[14] Landrieu asked whether Melancon wanted an attorney present; Melancon stated that he did not want an attorney, and he agreed to cooperate fully with the investigation. It is such elemental vignettes that touch deeply upon the credibility of conflicting tales.

showed that Melancon may have been involved in an attempt to obstruct justice. It was coincidentally at this same time that Melancon declined to answer any more questions and stated that he wanted a lawyer.

*Miranda* warnings are not automatically required when questioning an inmate and this Court finds that there was nothing inherently coercive, custodial, or compulsive above and beyond one's generic prison environment. The interview took place in an office setting, not in a holding cell or interrogation room. The agents were dressed in plain clothes and no weapons were drawn or displayed. Although already incarcerated, the defendant was not formally placed under arrest, he was not made to stand in an uncomfortable position; he was allowed to sit, he was not searched upon entry into the office, and he was not bound or physically restrained in any way. He was told his participation was purely voluntary and he was free to end the interview at any time or leave at any time; indeed, he did leave at one point during the interview to voluntarily retrieve some documents from his cell to show his "cooperation." There is no evidence that the investigators tricked or baited Mr. Melancon. There is no evidence contradicting Melancon's free and easy participation in the conversation; indeed, he ended the interview when he invoked his right to counsel after he was accused of participating in obstructing justice. But he freely returned to Pecora and Landrieu to assert to them that he

had cooperated.  A reasonable person in defendant's position would have understood himself not to be "in custody" but, rather, to be free to leave, and discontinue the interview.  Under the totality of the circumstances, while the Government contends that the agents did at least begin to provide <u>Miranda</u> warnings before they were interrupted by the defendant's acknowledgment of those warnings, warnings were not required in the first instance and Melancon's March 13 statements are admissible.  They were not given under the law's understanding of "custodial" in the circumstances of one in a general prison population when statements at issue were made.[15]

---

[15] The Court observes that many state courts have refused to suppress statements when defendants interrupted <u>Miranda</u> warnings to say that they knew their rights and have prior experience with the criminal justice system; that is, many state courts seem to recognize the so-called "prior criminal experience" exception to <u>Miranda</u>.  <u>See</u> <u>generally</u>, Thomas P. Windom, The Writing On The Wall: Miranda's "Prior Criminal Experience" Exception, 92 Va. L. Rev. 327 (2006)(proposing that a criminal defendant's actual knowledge of his <u>Miranda</u> rights should dispositively foreclose any <u>Miranda</u>-based suppression motions); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>People v. Nitschmann</u>, 35 Cal. App. 4th 677 (Cal. Ct. App. 1995)(upholding admission of statements when defendant interrupted detective's attempt to Mirandize him to blurt out a recitation of his rights and state "I know the whole bit" but failed to state that he had the right to have an attorney present during questioning; defendant was estopped from asserting that <u>Miranda</u> was infringed); <u>State v. Walden</u>, 336 N.W.2d 629 (N.D. 1983)(upholding admission of statements following interrupted Miranda warnings where an officer "was a little better than half-way through" and was attempting to advise of the right to have an attorney appointed if he was indigent when the defendant interrupted to state "I know my rights.  You don't have to go any further."); <u>State v. Perez</u>, 182 Neb. 680, 157 N.W.2d 162, 164 (1968)(finding that defendant waived further warnings when he interrupted to insist that he knew "more about them than you" because he had "been picked up and advised so many times before"); <u>cf.</u> <u>Myers v. State</u>, 256 So.2d 400 (Fla. Dist. Ct. App. 1972)(police officer suspect's admissions of guilt of murder of his wife were

II.  Fourth Amendment

Melancon next contends that documents confiscated by prison

_____

not inadmissible due to absence of <u>Miranda</u> warnings because there
was no custodial interrogation and further because police twice
attempted to give warnings but were interrupted by defendant who
stated that he knew and understood his rights; "it is not necessary
for the state to hold him down and read [his rights] to him"); <u>but
see</u> <u>State v. Verdugo</u>, 164 P.3d 966 (N.M. Ct. App. 2007)(holding, as
a matter of law, that a defendant cannot waive <u>Miranda</u> warnings
before being fully apprised of those rights; failure of detective
to complete Miranda warnings after being interrupted by suspect
asserting that he understood his rights, violated <u>Miranda</u>).
     These outcomes in state court are realistic.  Indeed, as
Justice Scalia remarked during oral argument regarding <u>United
States Patane</u>, 542 U.S. 630 (2004), in which Patane had twice
interrupted the police officer reading him his rights that he knew
his rights: "...is it fair to ask a policeman who's on the line of
duty when he tries twice to read him the rights and each time the
defendant says, no, I know them, forget it.  Is it fair to ask the
policeman to be the lawyer....  What if [the suspect] sticks his
fingers in his ears, saying, I don't want to hear them, I don't
want to hear them."  However, if the facts presented were different
-- if Melancon had shown that he was subject to custodial
interrogation -- the Court would be bound by the overwhelming force
of federal court decisions, which have suggested that partial
warnings are inadequate and any prior criminal experience exception
would be rejected. <u>See</u> <u>United States v. Street</u>, 472 F.3d 1298 (11th
Cir. 2006)(noting that suspect's status as police officer would not
obviate the requirement of <u>Miranda</u> warnings); <u>United States v.
Bland</u>, 908 F.2d 471 (9th Cir. 1990)(when hospitalized parolee
interrupted his parole officer's recitation of <u>Miranda</u> warnings
such that suspect was not advised of his right to have counsel
present during interview, <u>Miranda</u> warning was inadequate; the court
rejected the government's argument that Bland's prior experience
with the criminal justice system obviated the need for complete
warnings); <u>United States v. Longbehn</u>, 850 F.2d 450 (8th Cir.
1988)(the fact that the suspect was a police officer versed in
<u>Miranda</u> rights did not excuse the requirement that he be advised of
those rights); <u>United States v. Prior</u>, 381 F. Supp. 870 (M.D. Fla.
1974)(granting motion to suppress certain testimony given in grand
jury proceedings; observing that defendant "is a trained and
experienced, practicing lawyer" but nonetheless holding that
<u>Miranda</u> does not permit the court to "pause to inquire in
individual cases whether the defendant was aware of his rights
without a warning being given")(citation omitted).

officials on April 3, 2009 must be suppressed under the Fourth Amendment.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. Plainly, only *unreasonable* government intrusions into legitimate expectations of privacy are prohibited. <u>Carroll v. U.S.</u>, 267 U.S. 132 (1925); <u>U.S. v. Chadwick</u>, 433 U.S. 1, 7 (1977).

Specific to the prison setting, the Supreme Court has held that a convicted inmate has no reasonable expectation of privacy in his prison cell. <u>Hudson v. Palmer</u>, 468 U.S. 517, 526 (1984)(holding that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell"). The parties dispute the scope of <u>Hudson</u>'s rule: the defendant contends that <u>Hudson</u> does not apply because he seeks to suppress documents confiscated from the prison visitation area, not his cell; the Government counters that <u>Hudson</u> is not limited to the jail cell and, in any event, there are virtually no privacy rights retained by a convicted inmate.

It is true, as Melancon points out, that the Fifth Circuit has noted that <u>Hudson</u>'s holding was "specific to the cell." <u>United States v. Ward</u>, 561 F.3d 414, 418 (5th Cir. 2009)(noting that

defining the specific content and incidents of the right of privacy requires reference to a certain place and finding that "[e]xchanging the prison environment for a motel room and the prisoner for a prison escapee, we find that the balance of interests weighs against finding a constitutionally protected reasonable expectation of privacy"). Even assuming that assertion was not merely dicta, however, it is clearly well-settled that loss of privacy is an "inherent incident[] of confinement." <u>Hudson</u>, 468 U.S. at 528 (citation omitted). At most, convicted prisoners retain only "very minimal" privacy rights during their incarceration. <u>See</u> <u>Oliver v. Scott</u>, 276 F.3d 736, 744 (5th Cir. 2002). As the Supreme Court observed:

> Prisons, by definition, are places of involuntary confinement of persons who have demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others....
>
> Within this volatile "community," prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband...; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots...before schemes materialize....

<u>Id.</u> at 526-27. Moreover, the Fifth Circuit, in determining that a

prison escapee had no right of privacy in his motel room (or in his bag in his motel room), has with common sense and good reason identified yet another justification underlying a prisoner's loss of privacy rights: "[t]he loss of significant rights is an incident of imprisonment: the deprivation of privacy is a component of society's punishment." United States v. Ward, 561 F.3d 414, 418 (5th Cir. 2009)("Society, through our system of justice, has retracted [the Fourth Amendment] privacy right from prisoners as a necessary incident of incarceration, imposed for the purposes of retribution, deterrence, and rehabilitation...[w]e cannot find that this same society would recognize the escapee's expectation of this right as reasonable"). This Court is not persuaded to expand the scope of the severely diminished (if not extinct) privacy rights retained by inmates; no authority in support of such an extension is submitted. It seems counterintuitive to the real world. Indeed, the Court finds that Melancon's assertion that his right to privacy attaches to documents he brings to the visitation area is without merit -- his expectation on the facts proved to this Court is unreasonable. Even if Hudson's holding is confined to a prisoner's cell, it would be a paradox to recognize a greater right to privacy in a prison common area such as the visitation room, where inspections by prison personnel of materials in-and-out are routine, a part of prison life. There simply was no reasonable expectation of privacy, no unreasonable search or seizure. Cf.

<u>Stroud v. United States</u>, 251 U.S. 15, 21 (1919).[16]

     Accordingly, the defendant's Motion to Suppress is DENIED.


     New Orleans, Louisiana, January 21, 2010.


<i>Martin L. C. Feldman</i>

MARTIN L. C. FELDMAN<br>
UNITED STATES DISTRICT JUDGE

---

[16] In <u>Stroud</u>, certain letters written by an inmate while he was incarcerated came into the possession of the prison officials and were ultimately turned over to the warden, who furnished them to the district attorney.  The letters, which tended to establish that the inmate (who was incarcerated for a prior unrelated charge) was guilty of first degree murder, were offered in evidence at trial.  The Supreme Court determined that there was no unreasonable search and seizure of the letters, which the high court noted, came into the possession of the officials under established practice.  <u>Stroud</u>, 251 U.S. at 21-22.